IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Victor Diaz, | ) | |
| | ) | Case No. 14 C 50047 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Nedra Chandler, et al., | ) | |
| | ) | Judge Philip G. Reinhard |
| Defendants. | ) | |

## ORDER

For the reasons set forth below, the court grants defendants' motions to strike [119]; [124] and grants defendants' motions for summary judgment [85]; [88]; [93]. The case is terminated.

## STATEMENT - OPINION

This matter arises out of plaintiff Victor Diaz's 42 U.S.C. § 1983 allegations of deliberate indifference with regard to his dental care against defendants Wexford Health Sources, Inc., Dr. John O'Brien, Dr. John Crisham, Warden Nedra Chandler, and Amber Allen. Currently before the court are several motions for relief as set forth below.

On June 15, 2015, Dr. O'Brien and Wexford filed a joint motion for summary judgment [85], a memorandum in support [86], and Rule 56.1 statement of facts [87]. Dr. Crisham also filed a motion for summary judgment [88], memorandum in support [92], and Rule 56.1 statement [91]. Finally, Warden Chandler and Amber Allen filed a motion for summary judgment [93], memorandum in support [94], and Rule 56.1 statement [95].

On August 28, 2015, plaintiff filed his joint memorandum in opposition to the various motions for summary judgment [103], response to the Rule 56 statement of Dr. O'Brien and Wexford [109] and additional facts [104], response to the Rule 56 statement of Dr. Crisham [108] and additional facts [105]; [110], and response to the Rule 56 statement of Warden Chandler and Amber Allen [107] and additional facts [106].

On October 14, 2015, Dr. O'Brien and Wexford filed their reply [129] and response to plaintiff's additional facts [115]. Dr. Crisham filed his reply [122] and response to plaintiff's additional facts [120]. Warden Chandler and Amber Allen filed their reply [126] and response to plaintiff's additional facts [127].

Also on October 14, 2015, Dr. O'Brien and Wexford filed a motion to strike plaintiff's statement of additional facts against them and Dr. Crisham, and to bar reference to the *Lippert Report* referenced in plaintiff's statement of additional facts. *See* [119]. Dr. Crisham also filed a motion to bar reference to the *Lippert Report* [124]. On November 4, 2015, plaintiff filed a response jointly responding to both motions [131]. On November 18, 2015, defendants filed a joint reply [132]. The foregoing matters are now ripe for the court's review.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Prior to addressing the merits of the parties' motions, it is necessary to set forth the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact with respect to each motion. In addition, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to the plaintiff. *See Schepers*, 691 F.3d at 913.

## A. FACTUAL BACKGROUND.

### 1. Plaintiff's Treatment.

As an initial matter, while the relevant events regarding plaintiff's treatment go back to 2007, defendants argue that actions taken prior to 2012 cannot form the basis for liability because the statute of limitations to bring a claim regarding those actions expired before plaintiff signed his complaint on February 26, 2014. Plaintiff counters that all relevant events are timely because they are part of defendants' continuing violation in refusing to give him appropriate dental care, which did not end until after 2013. Before deciding the issue, the court will set forth the relevant factual background into pre-2012 and post-2012 events.

**Treatment Prior to 2012:**

Plaintiff Victor Diaz is an inmate incarcerated at the Dixon Correctional Center in Dixon, Illinois; he has been incarcerated at Dixon since approximately September of 2007. [109] at ¶ 1.

In 1991, plaintiff was involved in a 100-mile-per-hour auto collision, suffering a traumatic injury to his face that resulted in the extraction of fifteen or sixteen teeth, with immediate and continuing bone loss over the course of the following years. [109] at ¶ 4; [108] at ¶ 9. In addition,

at some point after the initial trauma, plaintiff's upper gums were cut out. *Id.* Following these events, while incarcerated in Texas, plaintiff had another four to five teeth extracted. *Id.* He was eventually extradited to Illinois, where he had another three teeth extracted. *Id.*

In March of 2007, while plaintiff was incarcerated at Stateville Correctional Center in Illinois, he had four upper teeth extracted. [109] at ¶ 5. At this time, some teeth remained in both his upper and lower mouth. In April of 2007, an unnamed dentist began the process of making him a new set of partial dentures for his upper and lower mouth. *Id.* To make dentures, the dentist first makes impressions and wax rims are placed in the patient's mouth to establish the relationship of the upper and lower jaws. [109] at ¶ 12. After the bite is established, the rims are sent to a fabrication lab, the lab sets teeth in the rims, and then it returns the dentures to the dentist for a try-in with the patient. *Id.* During a try-in, the teeth can be adjusted because the denture is made of wax that can be softened and adjusted to compensate for the patient's bite; after adjustments, the dentist sends the try-in dentures back to the lab for processing and finishing. [109] at ¶¶ 12-13.

On April 2, 2007, the dentist took impressions of plaintiff's upper and lower mouth in order to start the fabrication process for a set of upper and lower partial dentures. [109] at ¶ 5. After a mold was created for both dentures, on June 6, 2007, the dentist extracted the last two teeth in plaintiff's upper mouth. [109] at ¶¶ 6, 8. This made the mold for the partial upper denture obsolete and fabrication of the upper denture was discontinued. [109] at ¶¶ 6-7. In addition, impressions for a new full upper denture had to be delayed. *Id.* When a tooth is extracted, the underlying bone remodels itself and shrinks over the course of three-to-four months; thus, taking impressions and starting the fabrication process before the shrinkage is complete will result in voids under the denture. *Id.* Fabrication on the lower partial dentures continued, but prior to their completion, plaintiff was transferred to Dixon in September of 2007. [109] at ¶ 6; [108] at ¶ 13.

When plaintiff arrived at Dixon, he needed two things in order to complete fabrication of his dentures: first, he needed a new full upper denture to be fabricated at Dixon, and second, he needed his partial lower denture transferred from Stateville. Two dentists were responsible for the continued fabrication of his dentures at Dixon. Dr. O'Brien was the chief dentist at Dixon and an employee of Wexford Health Sources, a private corporation contracted to provide healthcare professionals and services to Dixon. [109] at ¶¶ 2-3. Dr. Crisham was a practicing general dentist who was independently contracted to work at Dixon. [108] at ¶ 16.

Treatment with regard to plaintiff's upper denture began immediately. On October 24, 2007, Dr. O'Brien scheduled plaintiff for a visit to the dental unit, examining him for the first time on November 14, 2007. [109] at ¶¶ 6, 9-10. Dr. O'Brien determined that the extractions of plaintiff's upper teeth had fully healed, and he placed plaintiff on the treatment list for fabrication of a full upper denture. [109] at ¶¶ 9-10.

Obtaining the lower dentures proved a slower process. According to plaintiff, when his dentures did not immediately arrive from Stateville, he asked for assistance from Warden Nedra Chandler, who was the Warden at Dixon for all times relevant to this action. [107] at ¶ 3. Plaintiff

informed Warden Chandler between one and four months after his transfer that his lower dentures had not arrived from Stateville; she told him she would call Stateville and procure the transfer. [107] at ¶¶ 49-51; [127] at ¶ 1. He spoke with her again two-to-three months later, informing her that his dentures had still not arrived; she apologized, explained that she had forgotten his information, and asked again for his name and number. [107] at ¶ 52. Plaintiff also maintains that he had a third conversation to the same effect with Warden Chandler approximately one month prior to April 16, 2008. [107] at ¶ 53; [87-1] at 46. She allegedly explained that "I've been so busy" and that she "going to take care of it." [87-1] at 46.

In the meantime, fabrication on plaintiff's upper denture continued. On December 5, 2007, Dr. Crisham saw plaintiff for the first time and took impressions of his upper jaw; during this visit, plaintiff informed him that his lower dentures had not yet arrived from Stateville. [108] at ¶¶ 16-17. Dr. O'Brien testified that he was present at this visit. [87-2] at ¶ 6. On February 27, 2008, Dr. O'Brien created a wax rim for the full upper denture and established plaintiff's bite relationship. [109] at ¶ 12. The rims were then sent to a lab for fabrication and sent back to Dixon with teeth for a try-in. *Id.* On March 20, 2008, Dr. O'Brien saw plaintiff for a try-in of his upper denture and adjusted the teeth as necessary. [109] at ¶¶ 12-13. The dentures were returned to the lab for final fabrication and returned before April 16, 2008. [109] at ¶¶ 12, 14.

It is undisputed that plaintiff received both his upper and lower dentures on April 16, 2008. [108] at ¶ 18. However, an important point of dispute between the parties is when the lower dentures arrived from Stateville and whether they played any role in the fabrication process described above. Dr. O'Brien testified that although plaintiff himself did not receive the lower dentures until both the upper and lower dentures were finally completed and fit on April 16th, the lower dentures from Stateville had arrived and were utilized in the fabrication process by February 27th, when Dr. O'Brien established plaintiff's bite relationship, and March 20th, when O'Brien performed a try-in. [115] at ¶ 7. Dr. O'Brien testified that while the lower dentures were first specifically noted in the medical records on April 16th, the records also make clear that he "had to" have had them by February 27th in order to set the bite of the dentures and send them to the lab for fabrication. [87-2] at 6. He also testified that he would have needed the lower partial dentures in order to perform the try-in on March 20th. [87-2] at 7.

Plaintiff maintains that his lower dentures were not utilized during the fabrication process at all, and in fact did not arrive from Stateville until April 16, 2008, when he actually received both dentures. [115] at ¶ 7. For this, he cites four pieces of evidence. First, a January 15, 2008 grievance and an April 4, 2008 response by a grievance officer, stating that "Inmate Diaz states that he transferred from Stateville CC and was in the process of obtaining dentures. He states that now that he has been transferred to Dixon CC, his dentures have not been issued to him. . . . According to the Director of Nursing, Inmate Diaz was seen on 2-27-08 and 3-20-08 by Dental Staff. It was noted that his dentures would be arriving any day now." [87-5] at 24-26. Second, plaintiff points to Warden Chandler's deposition testimony regarding the above-referenced April 4th grievance

response, which she was not involved in and had not seen prior to the deposition;[1] her testimony essentially consists of reading the language of the response and speculating as to what it might mean. [87-4] at 7-8. Third, plaintiff points to testimony from Dr. O'Brien explaining that the lower partial dentures from Stateville were first mentioned in the medical records when placed on April 16, 2008, although Dr. O'Brien also stressed that they had arrived earlier. [87-2] at 7. Fourth, plaintiff points to an acknowledgment of receipt he signed on April 16, 2008 when he obtained the dentures. [87-1] at 53.

Before moving on, the court notes that there cannot be a genuine dispute regarding a fact if one party's side of the "dispute" is not actually supported by the evidence. *See Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012) (noting that "factual disputes must be both material *and* genuine," "a factual dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and "[m]ere metaphysical doubt as to the material facts is not enough") (internal quotations omitted). Even taking all inferences in favor of plaintiff, the proffered evidence does not appear to provide any support for his assertion that the lower dentures did not arrive from Stateville until April. Warden Chandler's testimony is simply inadmissible speculation regarding a matter for which she has no personal knowledge, Dr. O'Brien's testimony is that the lower dentures were available earlier than April, and the acknowledgment of plaintiff's own personal receipt does not speak to when the lower dentures were available to the Dixon dentists. The only remaining evidence is the April 2, 2008 grievance response, stating "his dentures would be arriving any day now," which appears to be an acknowledgment that the final dentures would arrive soon from the lab. Without more, the court cannot find that it would be reasonable for a finder of fact to draw the separate inference suggested by plaintiff, that the arrival mentioned in the response was a reference, not to the final dentures from the lab, but rather to the lower dentures from Stateville.

Regardless, on April 16, 2008, Dr. O'Brien placed the completed full denture on the plaintiff's upper jaw and the partial denture on his lower jaw. [108] at ¶ 18. The dentures adhered to his mouth. *See id.*; [87-1] at 18. According to plaintiff, at the time, Dr. O'Brien stated "These work" but also that "Oh, they don't know how to make teeth there, uh-uh. They don't know what they're doing." [87-1] at 20. Plaintiff testified that Dr. O'Brien stated that once plaintiff was eligible for new dentures "I'm going to make you real dentures. They don't know what they're doing" and "what I'll make you will be better and you'll use them, you'll be able to do everything." *Id.* Dr. O'Brien "said something about they are adjustable, adjustable dentures" and "[h]e said these people didn't know how to make teeth." *Id.* It is undisputed that at the April 16th visit, Dr. O'Brien instructed plaintiff to use dental adhesive when wearing his dentures so that they would retain to his mouth; adhesive, labeled Poligrip, was available to prisoners at the commissary for purchase but was not provided for free to prisoners. [108] at ¶¶ 19, 29.

Approximately one hour after the visit, plaintiff lost retention of the upper denture. [108] at ¶ 18. According to plaintiff, while he did not purchase his own adhesive due to the cost, he used

---

[1]As was her prerogative, Warden Chandler delegated her grievance review duties and thus did not personally investigate plaintiff's grievances in this matter. [107] at ¶¶ 43-44.

5

Poligrip dental adhesive given to him by another inmate and the dentures stuck. [87-1] at 19. However, while eating dinner that evening, the top denture fell out again. *Id.* Approximately one week later, he went to sick call and was scheduled for an appointment with Dr. O'Brien. *Id.* Between the dinner and the follow up appointment, plaintiff stopped using the upper denture, but he has never stopped using the lower denture. *See* [87-1] at 18-19 ("[T]he bottom part, I got no problem with the bottom part.").

At the one-week follow up, Dr. O'Brien explained to him that he needed to use Poligrip, which would help with retention, and keep using the dentures, which he would get used to using. *Id.* When plaintiff complained that he could not afford to buy the Poligrip, Dr. O'Brien apparently told him to "take it up with the Warden." *Id.* Plaintiff testified that he spoke to Warden Chandler about the Poligrip cost, who referred him back to Dr. O'Brien, stating "that's his department." *Id.* During his deposition, plaintiff testified that he has the funds to pay for the adhesive but cannot truly afford them because he spends his money on necessary hygiene products and food that does not hurt his gums. [108] at ¶ 29. Plaintiff testified that a tube of Poligrip, lasting approximately two to two-and-a-half weeks, cost $5.00. *See* [87-1] at 7-8. He testified that, at the time in 2008, he made approximately $10 per month. *Id.* He also testified that at the time, his mother was sending him "$40 a month, sometimes 50." [87-1] at 9.

Plaintiff testified that after the April follow up appointment, he continued to use the Poligrip for approximately one month, but even with Poligrip his dentures would fall out while eating. *Id.* He stopped using the adhesive after one month because he could not afford it and it was not sufficiently helping him; he stopped using the upper denture itself after two months. *Id.*; [108] at ¶ 20.

It is undisputed that plaintiff did not speak to Dr. O'Brien or anyone at the dental unit again about the Poligrip or his dentures between the April, 2008 follow-up appointment and March 12, 2012. *See* [108] at ¶¶ 21-24. However, according to plaintiff, at some point between obtaining his dentures in 2008 and before his deposition in 2014 he complained to Warden Chandler that his dentures did not fit and hurt his mouth. [107] at ¶ 54; [127] at ¶ 3; [87-1] at 46. Again, while the fact is disputed, according to plaintiff Warden Chandler stated to him that "It's between you and [Drs. O'Brien and Crisham] now. You got your teeth." *Id.* It is unclear whether this conversation occurred shortly after he received his dentures in 2008 or once he began complaining about the dentures in 2012. *See id.*[2]

_____

[2]In his deposition, plaintiff testified that he had approximately five relevant conversations with Warden Chandler about his dentures. The first three involved his attempt to obtain his lower dentures from Stateville; the fifth occurred approximately "three months" before his October 1, 2014 deposition and involved his request to obtain a free set of new dentures; plaintiff never explained when the fourth conversation, pertaining to the fit of his dentures, took place. *See* [87-1] at 46.

The remaining pre-2012 events involve more routine matters. Plaintiff visited with Dr. Crisham on January 28, 2009 for a biannual exam, at which Dr. Crisham found two cavities; Dr. Crisham's dental chart reflects no complaints from plaintiff or problems with denture fit or cuts, bruising, or bleeding gums. [108] at ¶ 21; [109] at ¶ 17. Dr. Crisham testified that he did not specifically recall this appointment and referred to his chart and general practice. [120] at ¶ 6; [91-4] at 5-6. However, he also testified that he checked that the fit of plaintiff's dentures was adequate, and would have noted in his chart if there was a problem with the fit or if plaintiff ever had cut, bruised, or bleeding gums. [120] at ¶ 6; [91-4] at 5-6. On April 23, 2009 and April 30, 2009, Dr. O'Brien placed fillings for the two cavities that Dr. Crisham discovered; plaintiff did not complain about his dentures on either occasion. [108] at ¶ 22; [109] at ¶ 18. Plaintiff saw Dr. Crisham for another biannual exam on January 26, 2011; again, the records do not indicate problems with plaintiff's dentures or gums. [108] at ¶ 23; [109] at ¶ 19; [91-4] at 7.

It is worth noting that plaintiff testified that over the course of his incarceration, he visited sick call approximately one hundred times and "maybe once or twice" has complained of bleeding or scraped gums. [120] at ¶ 3. It is not clear whether these occasions during which he complained about his gums occurred prior to or after 2012; regardless, there is no evidence in the record that Dr. Crisham or Dr. O'Brien ever became personally aware of these issues. *Id.*

**Treatment After 2012:**

Plaintiff began seeking continued treatment for his dentures at some point in 2012. It appears that he first complained to Dr. Arthur Funk, medical director at Dixon, that his dentures did not fit during an examination; Dr. Funk testified that this exam "could very well have been [in] 2012" but could not recall exact date. [87-6] at 20. Plaintiff did not complain of discomfort or cuts in his mouth, and Dr. Funk did not notice any cut lips or gums during the exam. [109] at ¶ 21. In response to plaintiff's complaint and his examination, Dr. Funk referred plaintiff to Dr. Crisham. *Id.*

Dr. Crisham saw plaintiff on March 12, 2012 with regard to plaintiff's complaints regarding his loose dentures. [108] at ¶ 24; [109] at ¶ 22. When dentures come loose, they can be relined or the patient can use dental adhesive to help retain the dentures in place. [109] at ¶ 37. Dr. Crisham attempted to solve the problem through relining; he took a new dental impression of plaintiff's upper jaw and provided it to a third party dental lab to realign the upper denture. [108] at ¶ 25. However, Dr. Crisham explained to plaintiff that the realignment might not be effective because plaintiff's upper jaw had poor bone structure. *Id.* Dr. Crisham testified that this risk existed because plaintiff's aveolar ridge in his upper mouth did not have much bone or undercuts, which is important for retention. [109] at ¶ 23. It is disputed whether Dr. Crisham informed plaintiff that he would need to use dental adhesive if the relined denture was loose. [120] at ¶ 9. Dr. Crisham testified that dental adhesive is something he "always" mentions to his patients and that he "absolutely" would have mentioned this to plaintiff when readjusting his dentures and explaining that the realignment might not work. [87-3] at 48. On March 16, 2012, plaintiff returned and Dr. Crisham took impressions to reline the dentures, sending them to the lab for fabrication. [109] at ¶ 23. Again, Dr. Crisham did not notice bleeding, sore, or bruised gums. *Id.*

The relined dentures were delivered to plaintiff five weeks later. [109] at ¶ 23. On April 24, 2012, Dr. O'Brien provided plaintiff with the realigned upper denture and checked for fit. [108] at ¶ 27; [109] at ¶ 24. To determine whether a denture fits well, a dentist will try it in the patient's mouth to see if it is loose or rocking, thus failing to properly adapt and conform to the patient's mouth; x-rays are not necessary to determine if dentures are properly fitting. [109] at ¶ 36. According to plaintiff, while performing the final adjustments to the dentures to improve the fit, Dr. O'Brien stated "You know . . . if this doesn't work, you're shit out of luck." [87-1] at 21. Eventually, Dr. O'Brien determined that the dentures properly conformed and thus adaptation to the mouth was good. [108] at ¶ 27; [109] at ¶ 24. However, retention issues remained because, due to plaintiff's bone loss, the ridge form on his upper jaw does not have a sufficient amount of bone or undercuts for the upper denture to fit tightly without the use of dental adhesive. [108] at ¶ 26. Dentures are not designed to adhere to one's mouth, just to conform to one's mouth. [109] at ¶ 35. It is possible to have perfect adaptation of a denture but still have retention problems, especially where the patient has limited bone support to assist with the retention of the denture. *Id.*

Dr. O'Brien instructed plaintiff to purchase and use Poligrip adhesive for retention. [108] at ¶ 27; [109] at ¶ 25; [91-5] at 11, 45. He also ordered plaintiff to continue wear his dentures because he had to learn how to work with dentures in his mouth through functional learning, such as learning how to make movements without the dentures coming dislodged. [109] at ¶ 33. Using dentures is a learning process that takes time because the patient has to eat in a different fashion; this is a process that can take more than several months. [109] at ¶ 37.

Plaintiff attempted to use the re-lined dentures for three weeks before giving up when they continued to fall out; it is clear from his deposition testimony that he did not attempt to reuse Poligrip in 2012. [109] at ¶ 26; [87-1] at 9 (plaintiff testified that he obtained Poligrip "Just that one time" in 2008), 37-38 (when asked if he stopped using Poligrip after exhausting the tube given to him by another inmate in 2008, plaintiff testified "Basically. If it wasn't going to hold that day, what's going to make it hold now?"). At some point, plaintiff told Dr. O'Brien that he was going to place the dentures in his drawer and not use them. [109] at ¶ 33. During a visit with Dr. O'Brien, he and plaintiff discussed possible next steps. According to plaintiff, he suggested implants as a possible solution but Dr. O'Brien stated "we don't do implants" and also that plaintiff had "no bone for implants or something like that." [87-1] at 23-24. According to plaintiff, he spoke to the medical director, Dr. Funk, about solutions, such as free Poligrip from the dental unit or implants, to which Dr. Funk stated he would speak to Dr. O'Brien and get back to him. [87-1] at 24. Approximately "a couple weeks later," Dr. Funk informed plaintiff that he had spoken with Dr. O'Brien and "there is nothing they are going to do for me because I have no bone. And the implants, he said, forget about that." *Id.* It is unclear from plaintiff's testimony whether he suggested new removable dentures to Dr. Funk, Dr. O'Brien, or Dr. Crisham.

On June 6, 2012, plaintiff filed a grievance claiming that his dentures did not fit and detailing the oral and digestive issues he was suffering as a result. [127] at ¶ 15. His grievance was denied and his appeal to the ARB was unsuccessful. [127] at ¶ 16.

According to plaintiff, in addition to his grievances, he drafted two letters regarding his dental treatment, and addressed them to Amber Allen, the Health Care Unit Administrator at Dixon from April 16, 2010 to December 31, 2012. [107] at ¶¶ 4, 32-33. Allen is a nurse, but it is undisputed that she was functioning as an administrator and did not provide care or treatment to inmates at all times relevant to this action. [107] at ¶ 29. Her duties involved reviewing grievances filed by inmates regarding their healthcare providers, which she would review and respond to within thirty days. [107] at ¶¶ 29-30. It is undisputed that the two letters addressed to Allen "carbon copied" Warden Chandler, although it is unclear whether a separate copy was sent to Warden Chandler. [127] at ¶ 9. If an inmate sends a letter to Warden Chandler, it will be screened by her secretary and forwarded to her, the proper department head, or thrown away; Warden Chandler does not recall at any time receiving a letter from plaintiff. [107] at ¶ 59.

Only one of the letters that plaintiff purportedly sent was produced in discovery, which reads on the top right-hand corner "First Letter 9-13-12" and "Second Letter 1-2-13." *Id.* In his letter, plaintiff stated that his dentures did not fit, he was having difficulty consuming food, he had cut and bleeding gums, he had complained to various dentists and physicians without success, and his need for help was "urgent" and "dire." [127] at ¶ 5.

It is uncontested that Allen did not respond to either letter; Allen testified that she does not recall ever receiving the letters. [107] at ¶ 35; [127] at ¶ 5. According to plaintiff, he also attempted to speak to Allen on two occasions, once after sending each letter; both times he asked Allen if she had received his letter, and she responded that she had but was too busy to speak to him and would have to get back to him. [107] at ¶ 34; [127] at ¶ 7.

The remainder of plaintiff's post-2012 care involves more routine matters. On January 9, 2013, plaintiff returned to Dr. Crisham, who determined there were no issues with his gum tissue or dentures; he diagnosed two cavities on plaintiff's lower jaw, which Dr. O'Brien subsequently filled. [108] at ¶ 30. Plaintiff did not have issues with his gums, and there is no evidence he mentioned issues with his dentures. [109] at ¶ 27. On February 6, 2013, plaintiff had his last visit with Dr. Crisham, in which he sought treatment regarding sensitivity from the fillings he had received one week earlier. [108] at ¶ 31. Dr. Crisham did not notice any issues with plaintiff's gums. [109] at ¶ 28. Finally, in December 18, 2013, Dr. O'Brien examined plaintiff and scheduled one of his teeth for extraction. [109] at ¶ 29. On January 7, 2014, Dr. O'Brien extracted the scheduled tooth, which did not ultimately affect the fit of plaintiff's dentures. [109] at ¶ 30.

2. Plaintiff's Specific Complaints.

While the above-referenced events describe plaintiff's ongoing dental care at Dixon, several factual issues regarding plaintiff's post-2012 treatment relate to defendants' alleged ongoing failure or refusal to ameliorate plaintiff's dental issues. Specifically, plaintiff contends that defendants have failed to proscribe him a soft-food diet, have refused to provide a free set of new removable dentures, and have refused to provide him with dental implants. Plaintiff also claims that Wexford has

inadequate staffing and equipment. Because these claims are difficult to pinpoint in the chronology of plaintiff's medical treatment, the court will set forth the relevant facts with regard to each issue.

**Defendants' Failure to Order a Soft Food Diet:**

Plaintiff claims that he should have been put on a soft food diet, and that failure to do so contributed to his injuries. It is not disputed that plaintiff did not request a soft food diet from Dr. O'Brien or Dr. Crisham or that either of those defendants would have prescribed him one if asked. [109] at ¶ 34; *see also* [87-3] at 99 (Dr. Crisham deposition testimony that "getting back to the soft diets, we like to give those out. I mean, if the patient's happy, I'm happy. Basically it's just a signature"); [87-8] at 23 (P.A. Valdez testified she would have prescribed soft-food diet if asked). According to plaintiff, however, it is the policy of IDOC that the dentist recommend and order a soft food dental diet for inmates in need. [109] at ¶ 34. It is undisputed that defendants, including Dr. Crisham and Dr. O'Brien, did not ever order that plaintiff have a soft-food diet; rather, the parties dispute whether a soft food diet was clinically necessary. [115] at ¶¶ 31-32. Finally, there is arguably a dispute as to whether Dr. O'Brien was aware of plaintiff's general complaints in this regard; according to plaintiff, he was present when a grievance counsel called Dr. O'Brien to discuss plaintiff's complaints, including difficulty chewing his food. [109] at ¶ 34.

As related to this claim, according to plaintiff, his lower teeth will tear into his upper lip and he cannot properly masticate his food. [120] at ¶¶ 13, 13; [87-1] at 62. Plaintiff also contends that his gums have been repeatedly bruised and cut through his inability to properly chew his food. [115] at ¶ 18. Moreover, in addition to his dental issues, plaintiff has been treated in the medical unit for various medical conditions, including obesity (weighing 245 pounds on 9/24/2009, 254 pounds on 6/11/2013, and 256 pounds on 10/23/2014), uncontrolled diabetes, constipation, upset stomach, and heartburn. [108] at ¶¶ 40, 42. Plaintiff contends that these conditions have been caused or exacerbated by his dental issues, including the lack of a soft-food diet. Plaintiff has had ongoing gastrointestinal issues since before his denture issues, although he contends that they have intensified since his dental issues began. [109] at ¶ 54. He testified that his preexisting constipation has worsened since he has begun having issues with his dentures. [120] at ¶ 14.

As defendants point out in their statements of fact, plaintiff does not support the connection between his preexisting health concerns and his dental issues with medical evidence. [120] at ¶¶ 15-17. Further, plaintiff has not introduced evidence that a soft food diet was clinically necessary. [115] at ¶¶ 31-32.

It is undisputed that the only disclosed witnesses qualified to render expert medical opinions in this case are Dr. Funk, Dr. Dominguez, and Physician's Assistant Ava Valdez. [108] at ¶ 39. P.A. Valdez was a physician's assistant at Dixon who treated plaintiff for diabetes and other chronic medical conditions. [109] at ¶ 47. Dr. Dominguez is a Dixon physician who also treated plaintiff. *Id.* All of the medical experts in the case who have opined on the issue have

testified that Dr. Crisham's and Dr. O'Brien's treatment was within the standard of care. [108] at ¶¶ 43-44; *see, e.g.* [87-6] at 28; [87-9] at 30 (Dr. Dominguez would "defer to a dentist's opinion on whether a patient's dental treatment is adequate for that patient"). More specifically, P.A. Valdez testified that there was no evidence that plaintiff had digestive issues necessitating a soft food diet. [109] at ¶ 59. Dr. Dominguez testified similarly and noted that she has treated patients who have no teeth but do not need soft diets. *Id.* Moreover, according to Dr. Dominguez, none of plaintiff's medical conditions are related to his dental condition. [108] at ¶ 41. It is not contested that plaintiff is an uncontrolled diabetic and that his medical providers at Dixon and elsewhere have consistently advised him to lose weight. [109] at ¶¶ 48-51. P.A. Valdez and Dr. Dominguez have testified that plaintiff's gastrointestinal issues are caused by his diabetes, not his dental issues. [109] at ¶ 55.

**Defendants' Alleged Refusal to Pay for Poligrip Dental Adhesive:**

Although parsing plaintiff's many claims is somewhat difficult, plaintiff appears to argue that his injuries have been caused in part due to his inability to comply with his provider's preferred treatment method, getting used to his dentures with Poligrip dental adhesive, because he cannot afford the Poligrip and defendants have refused to provide it for him free of cost.

As noted, Dr. O'Brien originally instructed plaintiff to use Poligrip in April of 2008, when first providing him with his dentures. [108] at ¶¶ 19, 29. Plaintiff at first used Poligrip provided to him from another inmate, but eventually stopped using it because it did not help him use his dentures to eat. *See* [108] at ¶ 20; [87-1] at 18-19. In addition, he informed Dr. O'Brien that he could not afford the Poligrip; Dr. O'Brien referred him to Warden Chandler, who referred him back to Dr. O'Brien, to no result. [87-1] at 18-19.

Dr. O'Brien again instructed plaintiff to use Poligrip in 2012, after providing him with the relined dentures. [108] at ¶ 27; [109] at ¶ 25; [91-5] at 11, 45. He stated that through functional learning with the Poligrip, plaintiff would eventually learn to use his dentures. [109] at ¶¶ 33, 37. Plaintiff inquired with Dr. Funk as to whether he could obtain free Poligrip through the dental unit, to no avail. [87-1] at 24. As the court has noted, it is clear from plaintiff's testimony that the only time he attempted to use Poligrip was the free tube he obtained in 2008, and he did not make an effort to try it again in 2012. *See* [109] at ¶ 26; [87-1] at 9, 37-38 (when asked if he stopped using Poligrip after exhausting the tube given to him by another inmate in 2008, plaintiff testified "Basically. If it wasn't going to hold that day, what's going to make it hold now?").

Plaintiff testified that a tube of Poligrip, lasting approximately two to two-and-a-half weeks, cost $5.00. *See* [87-1] at 7-8. With regard to plaintiff's ability to pay in 2008, he testified that, at the time, he made approximately $10 per month. *Id.* He also testified that at that time, his mother was sending him "$40 a month, sometimes 50." [87-1] at 9. He spent the $10 monthly income from the state on hygiene material such as toothbrushes, toothpaste, shampoo, soap, and deodorant and soft food such as noodles, beans and oatmeal. [87-1] at 8-9. He spent the $40-$50 monthly income from his mother on chips, noodles, cookies, and items to trade for

11

more food.  [87-1] at 9.  With regard to plaintiff's ability to pay in 2012, plaintiff testified that at the time of his deposition, he had "about $60" in his prison trust account.  [87-1] at 37.  He also testified when speaking about the Poligrip that "If you want, I'll buy you one.  You can see what I'm talking about."  [87-1] at 8.  While referring to his inability to pay for the Poligrip in 2008, he testified that "But now I got a job, so it's okay."  [87-1] at 7.

### Defendants' Alleged Refusal to Pay for New Dentures:

Although defendants did reline his dentures, plaintiff claims that Wexford should have gone farther by providing him with a set of new dentures, and that their failure to do so contributed to his injuries.  *See* [32] at 4-5.  As noted above, plaintiff points to a conversation he allegedly had with Dr. O'Brien, wherein Dr. O'Brien told him that his dentures were poorly made and that after a three-year period, plaintiff would be entitled to a new set of free dentures, and Dr. O'Brien would make him a pair of "real dentures."  [109] at ¶ 78.

Although it is somewhat unclear on the record how frequently plaintiff inquired as to obtaining new removable dentures, plaintiff claims that he was informed on multiple occasions that he would need to pay out of pocket for new dentures.  According to plaintiff, Dr. Crisham explained to him that he would need to pay $99 if he wanted to obtain a completely new set of dentures.  [108] at ¶ 36.  Dr. Crisham testified that prisoners must pay a laboratory fee of approximately $100 to $215 if the inmate wishes to obtain a new set of dentures.  [120] at ¶ 11.  Plaintiff also testified that Dr. Crisham agreed when a dental aide told plaintiff that he could get a new bottom denture for $99.  [109] at ¶ 78. According to plaintiff , during one encounter with Warden Chandler, she told plaintiff that at Dixon, he would have to pay for new dentures.  [107] at ¶ 55.  Plaintiff also filed a February 15, 2013 grievance, requesting new dentures free of cost, which was denied with the explanation that, "In accordance with Department Rule 415, all treatment must be ordered by the Dentist and is not a matter of inmate's preference.  Per Dental, records show Inmate Diaz has both upper and lower dentures and both have been realigned.  Replacement cost would be $250 each."  See [127] at ¶ 17; [87-1] at 67.  It is undisputed that Wexford's policy is that if dentures are lost, stolen, or broken, the inmate must pay the laboratory cost to replace the dentures.  [109] at ¶ 78.

### Defendants' Alleged Refusal to Provide Dental Implants:

Plaintiff claims that after his relined dentures failed to fix his dental issues, defendants should have provided him with dental implants.  *See* [23] at 7.  As noted above, according to plaintiff, at some point he suggested dental implants to Dr. O'Brien as an alternative treatment, but was told that they were not an available option.  [109] at ¶ 34.  In part, the stated reason for not providing implants was that plaintiff had inadequate bone structure.  [87-1] at 24.  In addition, plaintiff contends that Dr. O'Brien told him that implants were not available because they are not in the budget and cost too much.  [115] at ¶ 25.  With regard to Dr. Crisham, plaintiff at one point filed a grievance stating that he asked Dr. Crisham for dental implants, was told by Dr. Crisham that he "did not seem to be losing any weight," and was dismissed; on the

other hand, plaintiff later testified that he never asked Dr. Crisham for implants and "I'd be lying to you if I said that." [120] at ¶ 5; [87-1] at 40, 62. In any event, the fact that plaintiff never requested dental implants from Dr. Crisham appears to be undisputed for purposes of summary judgment. [108] at ¶ 33.

Whether it is possible for inmates to receive dental implants at Dixon appears to be a matter of some dispute. Generally, under Wexford's contract with IDOC, Wexford is expected to provide dental care to inmates similar to what is provided to the general public. [109] at ¶ 64. As relevant to care at Dixon, Wexford follows IDOC administrative directives and policies, which Wexford does not draft and which supersede Wexford's own policies. [109] at ¶ 65. The IDOC's policy is that dentists use their clinical judgment and provide clinically indicated care. [109] at ¶ 66. Dr. O'Brien testified that he relied on IDOC policies when treating plaintiff. [109] at ¶ 66. It is undisputed that Wexford's own policies are guidelines, and dentists' clinical judgment supersedes the IDOC's and Wexford's policies. [109] at ¶ 67.

More specifically, the IDOC policies provide that removable dental prosthetics shall be provided on a case by case basis as determined clinically necessary by the dentist. [109] at ¶ 71. The IDOC policies do not mention fixed prosthetics; the parties agree that the omission of fixed dental prostheses from IDOC's policies excludes them as a treatment option. [109] at ¶ 73. However, the parties dispute whether dental implants are a fixed prosthetic or a classification of their own. [109] at ¶ 74. Wexford contends that its policy would be to consider the recommendation and clinical judgment of the treating dentist when considering whether to approve a request for dental implants. [109] at ¶ 74. On the other hand, Dr. O'Brien testified that his understanding was that dental implants are included in the definition of fixed prosthetic, and when asked if "there are any circumstances under which an inmate at Dixon would be provided dental implants," Dr. O'Brien replied "None that I can think of." [87-2] at 15-16.

With regard to whether dental implants can be a medical necessity, Dr. Crisham testified that although dental implants are generally not necessary, there are circumstances in which they could be a medical necessity. [120] at ¶ 4. With regard to plaintiff's specific circumstances, however, Dr. Crisham and Dr. O'Brien both testified that plaintiff was not a candidate for dental implants, primarily due to the lack of bone structure in his upper jaw, with contributing factors being that he had uncontrolled diabetes and poor oral hygiene. [108] at ¶ 46. Patients with insubstantial or substandard bone structure are not good candidates for dental implants. [109] at ¶ 42. Some patients may be negatively affected by placing dental implants, including diabetics because they face a higher risk of infection following surgery due to a lack of healing and the possibility that the implant will migrate through the patient's bone. [109] at ¶ 44.

**Wexford's Inadequate Staffing and Equipment:**

Lastly, in his statement of additional facts, plaintiff raises allegations that Wexford has inadequate staffing and equipment, which he contends resulted in "lack of care that could result

in lawsuits" and, specifically to him, led to him obtaining fewer x-rays than he otherwise might have had. *See* [115] at ¶¶ 34-37.

Presumably to bolster these claims, plaintiff includes in his statement of facts that Amber Allen left Dixon after December 31, 2012, testifying that she left because there were structural impediments toward her maintaining her expectations of level of care at the facility, arguably including inadequate medical equipment and staffing levels. *See* [127] at ¶¶ 19-21.

### 3. The *Lippert Report*.

As a final matter, and as relevant to defendants' motions to strike, *see* [119]; [124], in his statement of additional facts with regard to Dr. Crisham's motion for summary judgment, plaintiff includes six paragraphs of additional facts based on the report of a court-appointed expert in another case, *Lippert v. Godinez*, regarding dental care at Dixon. *See* [115] at ¶¶ 18-23. According to plaintiff, the *Lippert* report explains that dental care at Dixon, including the procedures for giving dentures, is generally inadequate, or alternatively explains that records are insufficient to determine whether adequate care is being given. *See id.*

## B. ANALYSIS

The court will begin by analyzing Dr. O'Brien's and Wexford's motion to strike and bar [119] and Dr. Crisham's motion to bar reference to the *Lippert Report* [124]. Next, the court will address the statute of limitation arguments addressed by the parties, to determine the temporal and factual scope of plaintiff's claims properly before the court. After resolving these preliminary issues, the court will analyze the summary judgment motions of the respective defendants in turn.

### 1. Motions to Strike and Bar Reference to the *Lippert Report*.

As noted, defendants have moved to strike references in plaintiff's statement of additional facts to the report of a court-appointed expert in another case, *Lippert v. Godinez*, regarding dental care at Dixon. *See* [115] at ¶¶ 18-23. The report purportedly explains that dental care at Dixon is inadequate in certain respects. *See id.* Plaintiff has not disclosed the author of the report or explained how he would introduce the findings of that report into evidence in this case.

Without testimony, however, the report is likely inadmissible unless the court can take judicial notice of it. "A court may take judicial notice of an adjudicative fact that is both 'not subject to reasonable dispute' and either 1) 'generally known within the territorial jurisdiction of the trial court' or 2) 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997) (quoting Fed.R.Evid. 201(b)). However, judicial notice "merits the traditional caution it is given, and courts should strictly adhere to the criteria established by the Federal Rules of Evidence before taking judicial notice of pertinent facts." *Id.*

There is no basis for judicially noticing the *Lippert Report*. The report is not alleged to be a finding of any court. Even if it had been, judicial notice would remain improper. "The application of a previous finding to a latter proceeding must be beyond reasonable dispute before a court may take judicial notice because the effect of taking judicial notice under Rule 201 is to preclude a party from introducing contrary evidence and, in effect, directing a verdict against him as to the fact noticed." *Id.* at 1083 (internal quotations omitted). "Moreover, if a court could take judicial notice of a fact simply because it was found to be true in a previous action, the doctrine of collateral estoppel would be superfluous." *Id.*

The Seventh Circuit has recently noted that even materials generally determined to be from reliable sources are not judicially noticeable. "Rule 201 of the Federal Rules of Evidence makes facts of which judicial notice is properly taken conclusive, and therefore requires that their accuracy be indisputable for judicial notice to be taken of them. . . . There is a high standard for taking judicial notice of a fact, and a low standard for allowing evidence to be presented in the conventional way, by testimony subject to cross-examination[.]" *Rowe v. Gibson*, 798 F.3d 622, 629 (7th Cir. 2015) (noting that internet research to even "reputable medical websites" could not be judicially noticed).

Here, the *Lippert Report* is an authored report of unknown reliability prepared for another case. As such, it is not the type of evidence "not subject to reasonable dispute" and thus the court will not take judicial notice of it. Moreover, the report is not even particularly relevant to the court's summary judgment determination here because it does not address whether the specific defendants in this case were deliberately indifferent. For the foregoing reasons, defendants' motions to strike and bar [119]; [124] are granted and the court will not consider plaintiff's statements of facts regarding references to the findings of the *Lippert Report*.

2. Statute of Limitations.

The statute of limitations is an important aspect to this case because many of plaintiff's claims relate to actions taken by defendants over seven years ago in 2007-2008. Many of the claims are essentially the same with regard to defendants refusing to provide plaintiff with free Poligrip or an alternative to his allegedly defective dentures. However, there are also claims that are distinct to the 2007-2008 treatment. Particularly relevant is plaintiff's claim that Warden Chandler failed to obtain his lower dentures from Stateville in a timely manner in 2007-2008, as well as plaintiff's claim that Dr. O'Brien improperly manufactured his upper denture in 2008 without the benefit of the Stateville lower dentures.

"The statute of limitations for § 1983 claims in Illinois is two years." *Gekas v. Vasiliades*, 2016 ___ F.3d ___, 2016 WL 805517, at *3 (7th Cir. Mar. 1, 2016). "Federal law, however, governs the accrual date for § 1983 claims, which is when the plaintiff knows or should know that his or her constitutional rights have been violated." *Id.* (internal quotations omitted). More specifically, "the statute of limitations for a § 1983 deliberate-indifference claim brought to redress a medical injury does not begin to run until the plaintiff knows of his injury and its

15

cause." *Devbrow v. Kalu*, 705 F.3d 765, 766 (7th Cir. 2013). This is true "even if the full extent or severity of the injury is not yet known." *Id.* at 768.

In addition, an important aspect of the statute of limitations in the deliberate indifference context is the doctrine of continuing violation. "A violation is continuing where 'it would be unreasonable to require or even permit [a prisoner] to sue separately over every incident of the defendant's unlawful conduct.'" *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013) (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir.2001)). The Seventh Circuit held in *Heard* that a continuing injury accrues in a situation where the defendants "learned [that the plaintiff] had a condition warranting medical attention yet unreasonably refused to provide that attention. Until then, the defendants [have] not violated [the plaintiff's] rights, and so [the plaintiff's] claim had not accrued." *Heard*, 253 F.3d at 318 (where "refusal continued for as long as the defendants had the power to do something about [plaintiff's] condition," there was a continuing violation). The doctrine is appropriate where "[t]he injuries about which the plaintiff is complaining in [the] case are the consequence of a numerous and continuous series of events." *Id.* at 319. "The continuing violation doctrine is also applicable when the state actor has a policy or practice that brings with it a fresh violation each day." *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006). "[W]hen the violation of the plaintiff's constitutional rights is a continuing one, the statute of limitations does not start to run any earlier than the last day of the ongoing injury." *Devbrow*, 705 F.3d at 770 (citing *Heard*, 253 F.3d at 319).

The Seventh Circuit's holdings thus show that applying the doctrine of continuing injury is appropriate where the defendants' alleged deliberate indifference involves a "continuous series of events," such that it would be unreasonable to require a prisoner to sue separately over each incident; when a plaintiff alleges refusal to treat, "the plaintiff can reach back in seeking to prove liability" to the time when treatment is initially refused, but the plaintiff's claims do not accrue and the statute of limitations does not begin to run until the refusal ends or the defendants lose "the power to do something about [the plaintiff's] condition, which is to say until [the plaintiff leaves the place of confinement]." *See Heard*, 253 F.3d at 318. Plaintiff argues that the court should apply the doctrine to this case, noting that he has sought treatment for as-yet-unresolved problems with his dentures since 2007-2008. However, a close review of the facts reveals that this case is not analogous to those where the Seventh Circuit found that the doctrine of continuing injury was appropriate. In fact, applying it to cases such as this one would create an unprecedented expansion of the doctrine and "would have the effect of eroding" the statute of limitations and its "important purposes, including protecting 'defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.'" *E.Y. ex rel. Wallace v. U.S.*, 758 F.3d 861, 867 (7th Cir. 2014).

As a preliminary matter, it is important to review the timeline to determine how plaintiff attempts to bridge the gap between the 2012 events and the 2007-2008 actions that he wishes to attack. With regard to Warden Chandler, plaintiff seeks to attack her alleged refusal to help him obtain his Stateville lower dentures from September of 2007 to (as late as) April of 2008. Although

16

any refusal would appear to have effectively ended in April of 2008, when plaintiff received his dentures, he attempts to connect Warden Chandler's failure to obtain the Stateville dentures to her later alleged deficiencies in assisting him with his dental care. Specifically, in 2008 Warden Chandler allegedly referred plaintiff back to Dr. O'Brien when plaintiff asked her for free Poligrip, stating "that's his department." *See* [87-1] at 18-19. Also, at some point between April, 2008 and approximately mid-2014, Warden Chandler allegedly referred plaintiff back to Dr. O'Brien and Dr. Chandler when he complained that the completed dentures did not fit and hurt his mouth, stating "It's between you and [Drs. O'Brien and Crisham] now. You got your teeth." [107] at ¶ 54; [127] at ¶ 3. Taking all inferences in favor of plaintiff, the court may assume that this conversation took place shortly after he received his dentures in 2008. Next, in 2012, plaintiff allegedly sent two letters to Amber Allen and Warden Chandler, which were ignored. Finally, at one point approximately "three months" prior to plaintiff's October 1, 2014 deposition, plaintiff alleges that he spoke to Warden Chandler about obtaining new free dentures and she told him that at Dixon, he would have to pay for new dentures. [107] at ¶ 55; [87-1] at 46.

With regard to Dr. O'Brien, plaintiff seeks to attack Dr. O'Brien's alleged failure in preparing the 2008 upper denture without the benefit of his Stateville lower denture. Again, this would appear to be a discrete event that was completed when plaintiff received his full denture on April 16, 2008. However, plaintiff seeks to connect it with Dr. O'Brien's other alleged deficiencies, such as the April, 2008 follow up appointment where plaintiff told Dr. O'Brien that his dentures were falling out when he ate, and Dr. O'Brien implored him to continue using the adhesive and get used to using the dentures. Following this appointment, the next alleged deficiency was in 2012 when Dr. O'Brien failed to provide additional care after the relined dentures did not alleviate plaintiff's dental issues.

The above timelines illustrate, first, that plaintiff was aware "of his injury and its cause" in 2008 regarding his dental issues, "even if the full extent or severity of the injury [was] not yet known." *Devbrow*, 705 F.3d at 766, 768. They also show that plaintiff's sporadic attempts to remedy his dental issues cannot be fairly characterized as an unbroken "continuous series of events." *See Heard*, 253 F.3d at 319. Rather, the relevant facts tend to break down into two relevant timelines, one involving the manufacture of his dentures in 2008, and one involving the relining of his dentures in 2012. There was an approximately four-year gap between plaintiff's April 16, 2008 follow up appointment with Dr. O'Brien, during which he explained that his dentures were not sticking, and his 2012 complaint to Dr. Funk that his dentures still did not fit. Likewise, there was a similar gap between his 2008 conversations with Warden Chandler and his 2012 conversations with her.

Plaintiff argues that the four-year gap can be bridged by the defendants continued refusal to treat his injuries. But, even taking all inferences in favor of plaintiff, it would be unreasonable to characterize the 2008 actions of defendants as a "refusal [that] continued for as long as the defendants had the power to do something about [plaintiff's] condition," *see Heard*, 253 F.3d at 318, or part of "a policy or practice that brings with it a fresh violation each day." *Savory*, 469 F.3d at 672. Warden Chandler's referred plaintiff to Dr. O'Brien and Dr. Crisham after learning

that his denture did not fit properly. A referral for an inmate to first seek treatment from his treatment provider cannot be construed as a blanket continuous refusal to assist him. Dr. O'Brien implored plaintiff, one week after giving him his dentures, to continue using the adhesive and learn to work with the dentures through functional learning, a process that plaintiff does not dispute can take more than several months. *See* [109] at ¶ 37. Adhering to a sensible conservative treatment plan which can take months to be effective at a time when plaintiff had only been using his dentures for one week cannot be fairly construed as a blanket ongoing refusal to treat which stretched from April of 2008 to 2012. This would be a different case if there was evidence that plaintiff continued to complain about his dentures only to be repeatedly put off with instructions to keep trying; however, as noted, it is undisputed that plaintiff did not complain to Dr. O'Brien about his dentures throughout the four-year period. *See* [108] at ¶¶ 21-24. Without any evidence of subjective awareness that plaintiff was continuing to suffer from an inability to use his dentures for four years, the defendants here cannot be said to have engaged in an ongoing deliberately indifferent refusal to treat.

Thus, unlike those cases where there is no significant break in the chain of a truly continuous series of events, applying the continuing violation doctrine here, where plaintiff stopped asking for treatment in 2008 and did not begin asking again until 2012, would allow him to effectively resurrect claims which accrued in 2008 and became untimely in 2010. It is clear from this record that if plaintiff had acted in 2011 by filing a complaint against his treatment providers, his claims would have been dismissed as untimely. Allowing plaintiff to revive the 2008 claims because he first sought additional related treatment and only then filed a complaint would so expand the continuing violation doctrine as to create an end run around the statute of limitations. Future litigants who find that they have potentially meritorious yet untimely claims could simply seek additional related treatment in order to create a "continuing violation." Keeping in mind that "[t]he statute of limitations is a condition of that waiver and thus should not be extended by judicial interpretation[,]" the court declines plaintiff's invitation to expand the continuing violation doctrine and agrees with defendants that the 2007-2008 claims are untimely and only the post-2012 events are at issue here.[3]

_____

[3]Even if the court were to consider the 2007-2008 manufacture of the dentures, the only evidence in the record is that Dr. O'Brien and Dr. Crisham exercised their medical judgment when creating them and gave them to plaintiff after ensuring that they were a proper fit. In addition, as the court noted in the factual background section, there is insufficient evidence to raise a genuine issue of material fact as to whether Dr. O'Brien crafted the upper denture without the benefit of the lower dentures. As such, the court would not find that there was a genuine issue of fact as to whether Dr. O'Brien was deliberately indifferent in creating the dentures even if it were to accept plaintiff's continuing violation argument. With regard to Warden Chandler and her delay in obtaining plaintiff's lower denture from Stateville, even construed favorably to plaintiff, the facts here at best support an inference of negligence. As such, the court would not find that there is a genuine issue of fact as to whether Warden Chandler was deliberately indifferent in obtaining plaintiff's lower denture from Stateville.

3. Dr. O'Brien.

As relevant to the post-2012 events, plaintiff argues that Dr. O'Brien was deliberately indifferent to his serious medical condition by failing to appropriately treat his dental issues. Specifically, plaintiff argues that because his dentures still did not fit, Dr. O'Brien should have gone further than the treatment provided by prescribing him a soft food diet, providing him with Poligrip free of charge, providing him dental implants, providing him new free removable dentures, and/or providing him dental implants.[4]  Dr. O'Brien argues that summary judgment should be granted because plaintiff's medical condition is not "objectively serious" and he has failed to raise a genuine issue of material fact as to whether Dr. O'Brien was deliberately indifferent.

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display deliberate indifference to serious medical needs of prisoners." *Greeno v. Daley*, 414 F.3d 645, 652 (7th Cir. 2005) (internal quotations omitted).  For a prison official to be liable on a claim of deliberate indifference, the medical need must be "objectively serious" and the official must have "acted with a sufficiently culpable state of mind" in that he had "subjective knowledge of the risk to the inmate's health and . . . disregard[ed] that risk." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010).  "An objectively serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotations omitted).  Deliberate indifference is "something approaching a total unconcern for [a prisoner's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm[.]" *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992) (citations omitted). "Before a doctor will be found deliberately indifferent, the plaintiff must show subjective indifference." *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008).  "An official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and the official must also draw the inference." *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 776, 779 (7th Cir. 2014) (deliberate indifference is not shown where "a jury could not conclude reasonably that [the] defendants had the requisite subjective awareness needed for a deliberate indifference claim").

There are several ways to establish deliberate indifference.  The first and most obvious is to provide evidence that "the defendant must have known that the plaintiff was at serious risk of

_____

[4]Although plaintiff argues that each of these things should have been done, it is somewhat unclear from his complaint, deposition testimony, and summary judgment briefs which defendants he specifically blames for these deficiencies.  For example, at times it is unclear whether plaintiff is attacking his specific treatment providers or simply Wexford's policies, as he testified that Dr. O'Brien and Dr. Crisham are "good doctor[s]" and that his primary complaint is that his upper denture does not fit.  [108] at ¶ 45; [87-1] at 22.  As such, the court will presume that plaintiff levels these challenges against all relevant defendants, specifically Dr. O'Brien, Dr. Crisham, and Wexford.

being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham,* 394 F.3d 469, 478 (7th Cir.2005) (quotation and brackets omitted). However, as the Seventh Circuit recently explained, a prisoner need not show that his medical needs were "literally ignored," and instead "[d]eliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (internal citations omitted); *see also Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) ("A dentist demonstrates deliberate indifference by failing to treat the patient promptly, thus prolonging the patient's pain, while knowing that the patient may well be in serious pain that is treatable.").

On the other hand, "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). A prison physician "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). The Seventh Circuit has held that "medical professionals . . . are entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances at issue" and "may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (internal quotations and alterations omitted). Moreover, when making the determination "whether the course of treatment was so far afield as to allow a jury to infer deliberate indifference[,]" the court must focus on what the doctor knew at the time of treatment. *See Duckworth*, 532 F.3d at 680.

Here, the court need not decide whether plaintiff suffered a serious injury because it is clear that Dr. O'Brien did not act with deliberate indifference.[5] With regard to Dr. O'Brien's actual treatment, along with Dr. Crisham, he sought to address plaintiff's complaints by re-fitting his dentures. The only medical testimony in the case is that this was an appropriate medical treatment course. With regard to plaintiff's specific complaints about treatment he was not

---

[5]The court notes that the Seventh Circuit has found injuries similar to plaintiff's to be "objectively serious" conditions. *See Wynn v. Southward*, 251 F.3d 588, 593-94 (7th Cir. 2001) ("[Plaintiff] alleges that he has been unable to chew his food without his dentures, significantly impeding his ability to eat, and that he has suffered bleeding, headaches, and 'disfigurement.' These allegations are sufficient to demonstrate that [plaintiff] has a serious medical need for his dentures.").

given, as noted below, there is nothing in the record to suggest that different or additional treatment was required.

Specifically, with regard to the soft food diet, while arguably Dr. O'Brien became aware at some point that plaintiff was having difficulty chewing his food, *see* [109] at ¶ 34, it is undisputed that plaintiff did not request a soft-food diet from Dr. O'Brien and the only expert testimony proffered is that a soft-food diet was not medically necessary in this case. *See* [109] at ¶ 59; [108] at ¶ 41. To the contrary, while plaintiff notes that his overall health is poor, his treatment providers have testified that his obesity, uncontrolled diabetes, and gastrointestinal issues are preexisting conditions which are not related to his dental issues or the lack of a soft food diet. *See* [109] at ¶¶ 55, 59. Moreover, there is no evidence that Dr. O'Brien was personally aware that plaintiff's difficulties were such that he had bleeding or sore gums. Thus, the facts in this record are insufficient to establish that Dr. O'Brien "had the requisite subjective awareness needed for a deliberate indifference claim," *Pittman*, 746 F.3d at 779, or that "no minimally competent professional would have so responded under the circumstances at issue," *McGee*, 721 F.3d at 481.

With regard to Poligrip, taking all inferences in favor of plaintiff it is arguable that Dr. O'Brien had the discretion to provide Poligrip free of cost. *See* [87-1] at 18-19 (according to plaintiff, Warden Chandler referred him to Dr. O'Brien regarding his complaint that he could not afford Poligrip, stating "that's his department"). However, the Seventh Circuit has held that it is "well established" that "the Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care." *Poole v. Isaacs*, 703 F.3d 1024, 1026-27 (7th Cir. 2012). The court in *Poole* found that there was no deliberate indifference in imposing a $2.00 co-payment for dental procedures where the plaintiff "had sufficient funds in his trust fund account but opted to refuse treatment rather than part with his money[,]" because the plaintiff "was not deprived of dental services for reasons beyond his control." *Id.* at 1026-27. Moreover, the court noted that any argument the plaintiff might have regarding whether he qualified for some form of indigence exception to payment would be "just a state-law question that cannot be pursued under § 1983." *Id.* at 1027; *see also Hightower v. Godinez*, 524 F. App'x. 294, 296 (7th Cir. 2013) ("[T]o the extent plaintiff argues that he was exempt from the co-payment because he met a statutory exception . . . that is a question of state law, which cannot form the basis for a § 1983 claim."). District courts in the Seventh Circuit "have echoed the Seventh Circuit's holding in *Poole* in the context of prescribed over-the-counter medications available for purchase at the prison commissary." *Taylor v. Corizon Medical Services*, 2013 WL 4678670, at *6 (S.D. Ind. 2013) (collecting cases). In *Taylor*, the court found that it was not deliberately indifferent to force plaintiff to purchase "[n]atural fiber powder[, which] can be purchased from [the prison] commissary for $6.25" because "the undisputed evidence shows that [the plaintiff] had the financial means to obtain [the] fiber supplement at the prison commissary." *Id.* at **3, 6.

Here, it is clear from his testimony that plaintiff had a monthly income of approximately $50-$60 per month in 2008, well over the approximately $10 per month cost of obtaining

Poligrip continuously. The fact that he preferred to spend some of his money on chips and cookies shows that he made a conscious decision to spend his money on certain items that he deemed more important than the Poligrip. In 2012, plaintiff testified that he had $60 in his account, and makes sufficient money due to having a job; he even offered to purchase a tube of Poligrip for the attorney taking his deposition. Thus, there was no deliberate indifference because plaintiff "was not deprived of dental services for reasons beyond his control." *Poole*, 703 F.3d at 1026-27. To the extent plaintiff argues that he should not have been charged because he was indigent, regardless of his technical ability to pay, his qualification for an exception to the general rule "is a question of state law, which cannot form the basis for a § 1983 claim." *Hightower*, 524 F. App'x. at 296; *Poole*, 703 F.3d at 1027. As such, the court cannot find that charging plaintiff for Poligrip was a constitutional deprivation.

With regard to new dentures, the evidence in this record would be sufficient to create a fact issue as to whether the cost, unlike that of Poligrip, was so prohibitively expensive as to be effectively out of reach for plaintiff. However, here there is no evidence that Dr. O'Brien had any discretion to provide new dentures free of cost in light of explicit policies to the contrary. Even leaving the lack of authority aside, however, there is no indication that Dr. O'Brien believed or was required to conclude that new dentures were medically necessary. True, plaintiff proffers some evidence from 2008 that Dr. O'Brien was not enamored with his provided dentures, *see* [87-1] at 20 ("Oh, they don't know how to make teeth there, uh-uh. They don't know what they're doing."), and believed that he could do a better job, *see* [87-1] at 20 ("[W]hat I'll make you will be better and you'll use them, you'll be able to do everything."), as well as evidence from 2012 that Dr. O'Brien did not believe the provided dentures could be further improved beyond relining, *see* [87-1] at 21 ("You know . . . if this doesn't work, you're shit out of luck."). However, at the time Dr. O'Brien allegedly disparaged the dentures, he also explicitly stated that "[t]hese work." *See* [87-1] at 20. Moreover, Dr. O'Brien testified that plaintiff's dentures were fit well and adapted to his mouth; the issue was not the dentures themselves, but the conditions of plaintiff's mouth. As such, he made the medical determination that the appropriate course was for plaintiff to use Poligrip adhesive and practice with the dentures to improve his ability to use them through functional learning, a process that can take months. It is not seriously disputed that plaintiff failed to fully follow this treatment plan either in 2008 or 2012, by not purchasing new Poligrip and using it to improve his use of the dentures through functional learning. As such, it is impossible to know whether Dr. O'Brien's treatment plan would have worked if implemented.

Plaintiff appears to believe that instead of ordering a conservative functional learning plan with Poligrip, Dr. O'Brien should first have provided him new "better" dentures. While Dr. O'Brien's comments suggest that may have been an appropriate course, perhaps even optimal, none of his alleged statements, testimony, or other evidence in the record establishes that his decision to continue with conservative treatment was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee*, 721 F.3d 481-82 (physician's statement to prisoner that leg restraints "shouldn't be on your legs" was simply a "conclusory

22

remark [that] fails to create a question of fact as to whether requiring the metal leg restraints was a substantial departure from accepted medical judgment."). "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible[.]" *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Even if plaintiff is correct that providing new dentures would have been the most effective treatment, "[n]either medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference[.]" *Berry*, 604 F.3d at 441. Further, as plaintiff failed to fully comply with Dr. O'Brien's treatment plan, the record provides no reasonable basis for a jury to discount the deference usually afforded to medical professionals and find that Dr. O'Brien's chosen treatment plan was ineffective, let alone "blatantly inappropriate." *Perez*, 792 F.3d at 777.

Finally, with regard to dental implants, the issue is not whether implants could be medically necessary in certain hypothetical instances, but whether they were medically necessary in this case. Here, as noted above, the only medical testimony is that plaintiff was not a good candidate for implants due to his personal characteristics, such as the structure of his mouth and his uncontrolled diabetes. There is no medical evidence to the contrary. As such, the court cannot find that Dr. O'Brien's decision not to pursue implants was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee*, 721 F.3d at 481.

Thus, Dr. O'Brien was not deliberately indifferent toward plaintiff. For the foregoing reasons, Dr. O'Brien's motion for summary judgment [85] is granted.

4. Dr. Crisham.

The analysis is virtually identical with respect to Dr. Crisham. As with Dr. O'Brien, plaintiff argues that Dr. Crisham should have gone further than the treatment provided by prescribing him a soft food diet, providing him free Poligrip, providing him new free removable dentures, and/or providing him dental implants. Like Dr. O'Brien, Dr. Crisham argues that summary judgment should be granted because plaintiff's medical condition is not "objectively serious" and he has failed to raise a genuine issue of material fact as to whether Dr. Crisham was deliberately indifferent.

Dr. Crisham's motion must be granted for substantially the same reasons as with Dr. O'Brien's motion. Dr. Crisham acted similarly to Dr. O'Brien. As soon as plaintiff was referred to him regarding his dental complaints, Dr. Crisham exercised his medical judgment and sought to address plaintiff's complaints through a re-fitting. At no point did he ignore plaintiff and there is no evidence in the record to suggest his actions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *McGee*, 721 F.3d at 481. The analysis with regard to the soft food diet, free Poligrip, free dentures, and dental implants is substantially similar. Dr. Crisham's argument for summary judgment is, if anything, even stronger because, unlike Dr. O'Brien, there is no evidence that Dr. Crisham was aware that

plaintiff had chewing difficulties and no evidence that he had any authority to provide free Poligrip. *See Pittman*, 746 F.3d at 776 ("An official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and the official must also draw the inference."). As such, the court finds that Dr. Crisham was not deliberately indifferent and his motion for summary judgment [88] is granted.

   5. Wexford Health Sources, Inc.

   Plaintiff claims that Wexford is liable because it had deliberately indifferent policies regarding soft food diets, free Poligrip, free new dentures, and dental implants, as well as the deliberately indifferent practice of inadequate staffing and medical equipment, all of which contributed to his injuries.

   "In this circuit, a private corporation cannot be held liable under § 1983 unless it maintained an unconstitutional policy or custom." *Perez*, 792 F.3d at 780. "Respondeat superior liability does not apply to private corporations under § 1983." *Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). Moreover, "isolated incidents do not add up to a pattern of behavior that would support an inference of a custom or policy, as required to find that Wexford as an institution/corporation was deliberately indifferent to [a prisoner's] needs." *Id.* at 796. Finally, the fact that a plaintiff argues a policy or practice is deliberately indifferent in the abstract is insufficient; "[r]ather, a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation." *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (internal citations omitted). "In other words, it is when execution of [the] policy or custom inflicts the injury that the . . . entity is responsible under § 1983." *Id.* (internal quotations omitted).

   The court's analysis with regard to Dr. O'Brien allows for an abbreviated discussion of plaintiff's claims against Wexford. With regard to soft food diets, plaintiff proffers no evidence that Wexford discouraged soft food diets; if anything, the evidence is to the contrary. *See* [87-3] at 99 (Dr. Crisham deposition testimony that "getting back to the soft diets, we like to give those out. I mean, if the patient's happy, I'm happy. Basically it's just a signature"). At best, the evidence here shows an "isolated incident" that does not raise an inference of deliberate indifference against Wexford. *See Shields*, 746 F.3d at 796. With regard to free Poligrip, as the court has already noted, Wexford was not required to provide free Poligrip to prisoners who could pay for it. *See Poole*, 703 F.3d at 1027. With regard to free new dentures, the issue is not whether Wexford's policy of charging an arguably prohibitively high cost for dentures could theoretically raise constitutional concerns in a situation where new dentures were medically necessary. Here, it is sufficient that plaintiff has not proffered evidence that new dentures were medically necessary in his situation, as shown above, and as such plaintiff cannot show that Wexford's policy was "the 'direct cause' or 'moving force' behind [a] constitutional violation" because there was no underlying violation in not providing him new dentures. *See Woodward*, 368 F.3d at 927. The same holds true for the dental implants; because plaintiff has not proffered sufficient evidence that implants were medically indicated in his case, Wexford's policies

regarding fixed prostheses were not "the 'direct cause' or 'moving force' behind [a] constitutional violation." *See id.* Finally, with regard to plaintiff's claims that Wexford maintained inadequate staffing levels and medical equipment, there is insufficient evidence on the record to raise a genuine issue of material fact that these alleged deficiencies contributed to plaintiff's injuries or caused him any significant delay, and as such, again he cannot show that they were "the 'direct cause' or 'moving force' behind [a] constitutional violation." *See id.*

For the foregoing reasons, plaintiff has failed to raise a genuine issue of material fact as to whether Wexford was deliberately indifferent to his medical needs, and as such Wexford's motion for summary judgment [85] is granted.

6. Warden Chandler and Amber Allen.

Plaintiff's claims against Warden Chandler and Amber Allen amount to the fact that they did not prevent Wexford and the physicians from treating him with deliberate indifference after he spoke to them and sent letters and grievances regarding his treatment.

Under Seventh Circuit precedent, "a supervising prison official cannot incur § 1983 liability unless that officer is shown to be personally responsible for a deprivation of a constitutional right." *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). "This means that to recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution. *Perez*, 792 F.3d at 781. An "official satisfies the personal responsibility requirement . . . if the conduct causing the constitutional deprivation occurs with [his] knowledge and consent." *Vance*, 97 F.3d at 992 (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)); *see also Perez*, 792 F.3d at 781 ("[D]eliberate indifference may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or 'turn[s] a blind eye' to it." ). "An inmate's correspondence to a prison administrator may . . . establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez*, 792 F.3d at 781-82. The Seventh Circuit has "allowed [an] inmate's § 1983 action to survive summary judgment" where "we concluded that [a] superintendent knew of the denial of [materials the inmate was constitutionally entitled to] because of the prisoner's 'many letters' to him, and that the superintendent had systematically ignored these requests for redress." *Id.* at 782 (citing *Gentry v. Duckworth*, 65 F.3d 555 (7th Cir. 1995)).

The Seventh Circuit has discussed the standards applicable where an official is supervising medical personnel. "If a prisoner is under the care of medical experts . . . a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). "However, nonmedical officials can be chargeable with deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* (internal quotations and alterations omitted). In order to show liability in this manner "[t]he

plaintiff must demonstrate that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety," and "once an official is alerted of such a risk, the refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Id.* at 755-56 (internal quotations and alterations omitted).

Here, plaintiff's claims against Warden Chandler and Allen must fail. As noted, before the court are plaintiff's claims that they failed to appropriately supervise Dr. O'Brien and Dr. Crisham for plaintiff's post-2012 care. The court has found that there was no underlying constitutional injury with regard to that care. As such, plaintiff cannot show that they had sufficient "reason to believe" that he was being mistreated or that there was "an excessive risk to inmate health or safety" that they could have prevented if they had intervened in his treatment plan. *See Arnett*, 658 F.3d at 755-56. Thus, plaintiff has failed to raise a genuine issue of material fact as to whether Warden Chandler's and Amber Allen were deliberately indifferent to his medical needs and, as such, their motion for summary judgment [93] is granted.

While the court recognizes that plaintiff has several ongoing medical issues that affect his overall health, including obesity, uncontrolled diabetes, gum issues, and gastrointestinal problems, he has not raised a genuine issue of fact as to whether those issues were caused or related to the actions, much less deliberate indifference, of the named defendants. As such, he does not have sufficient evidence to raise a claim under section 1983, and for all the foregoing reasons, the court grants summary judgment [85]; [88]; [93] with regard to all defendants. The case is terminated. The court also would thank recruited counsel for their extensive efforts in representing plaintiff.

Date: 3/18/2016                ENTER:

_Philip G. Reinhard_

_____
United States District Court Judge

Electronic Notices. (LC)